## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA

LESLIE TURNER,

          Plaintiff,

vs.

CORTEVA, INC.; SYNGENTA CROP
PROTECTION AG; SYNGENTA CORP.;
SYNGENTA CROP PROTECTION, LLC; CHS
INC.; NUTRIEN AG SOLUTIONS, INC.; DOE
DEFENDANT WHOLESALERS; AND DOE
DEFENDANT RETAILERS,

          Defendants.

CIVIL ACTION NO. 1:22-cv-2411

**JURY TRIAL DEMANDED**

**CLASS ACTION COMPLAINT**

## CLASS ACTION COMPLAINT

1.      Plaintiff Leslie Turner ("Plaintiff") alleges the following based upon personal knowledge as to matters relating to himself, and upon information and belief and based on the investigation of counsel as to all other matters.  Plaintiff, a farmer, brings this action on behalf of himself and a proposed Class of similarly situated direct purchasers of certain crop protection products ("CPPs", which include herbicides, pesticides, and fungicides) manufactured by Defendant manufacturers Corteva, Inc. and Syngenta Crop Protection AG, Syngenta Corp., and Syngenta Crop Protection, LLC (collectively, "Syngenta", and collectively with Corteva, "Manufacturer Defendants"), and the generic versions of those CPPs, and distributed and sold by entities including the Manufacturer Defendants' co-conspirators Defendants CHS Inc. ("CHS"), Nutrien Ag Solutions, Inc. ("Nutrien"), John Doe Defendant Wholesalers 1-5, and John Doe Defendant Retailers 6-10 (collectively with Corteva and Syngenta, "Defendants"). Plaintiff and

the proposed Class were harmed and continue to be harmed by having to purchase CPPs at prices that were artificially inflated due to Defendants' anticompetitive conduct as alleged herein.

## NATURE OF THE ACTION

2.      Defendants Corteva and Syngenta each manufactured several CPPs that are crucial to large numbers of American farmers. Defendants' CPPs and the active ingredients therein enjoyed a period of patent protection and regulatory protection under which they were lawfully protected from competition. Once those periods expire, generic manufacturers are allowed to produce their own versions of those CPPs, and that competition typically drastically reduces the price of those CPPs.

3.      In order for Defendants Corteva and Syngenta to maintain their market dominance even after their patent and regulatory exclusivities on their CPPs expired, Defendants used "loyalty programs" under which they made substantial payments to their wholesalers and in certain cases, also retailers, in exchange for the wholesalers and retailers agreeing to strictly limit their purchases of – and thereby prevent widespread distribution of – generic versions of Defendants' CPPs. This conduct ensured that Defendants' far more expensive branded CPPs would be most of what the wholesalers and retailers purchased and sold to their respective customers.

4.      Since a small number of wholesalers control a very large share of all sales of CPPs to retailers that sell to farmers, and some of the wholesalers also own a large number of their own retail outlets, when there is a loyalty program in effect for a particular CPP, this forecloses generic CPP manufacturers from nearly all of the retail market for that CPP.  The other channels available to generic CPP manufacturers to get their products to market are far more limited. When there is a loyalty program in place for a particular CPP, the generic CPP manufacturers can typically only sell much smaller volumes of that CPP, or often cannot sell it profitably at all, requiring them to

exit the market or to not enter it in the first place. Defendants CHS and Nutrien, which are both wholesalers and retailers, participated in these loyalty programs.

5.      Therefore, the Manufacturer Defendants' "loyalty payment" system has the following effects: (1) the Manufacturer Defendants are able to maintain monopoly power for the sales of each of these CPPs even though the patent and regulatory protection have expired and there should be open competition from generics; (2) the Manufacturer Defendants are able to continue to charge artificially inflated prices for those CPPs as a result of excluding most generic competition; (3) the Manufacturer Defendants obtain supracompetitive profits as a result; (4) the Manufacturer Defendants share part of those supracompetitive profits with the Wholesaler Defendants (and in Syngenta's program, also the Retailer Defendants) to ensure their cooperation with this scheme; (5) farmers have to pay much higher prices for those branded CPPs than they would if there was the open competition that would occur absent Defendants' conduct; and (6) the lesser amounts of generic versions of those CPPs that are able to be sold are also priced higher than they would be if there was the open competition that would occur absent Defendants' conduct.

6.      Defendants' anticompetitive scheme has reduced competition in the market for the CPPs discussed herein and thereby artificially inflated the price of those CPPs and of the generic competitors to those CPPs. Plaintiff and members of the proposed Class have been injured by paying artificially inflated prices for their CPP purchases.

7.      Plaintiff seeks treble damages and injunctive relief, demanding a trial by jury of all issues so triable, under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1-2), and Sections 3, 4 and 16 of the Clayton Act (15 U.S.C. §§ 14, 15, 26).

## JURISDICTION AND VENUE

8.      Plaintiff brings claims under Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1-2, and Section 3 of the Clayton Act, 15 U.S.C. § 14, seeking treble damages pursuant to Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15, and injunctive relief pursuant to Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26. This Court has subject matter jurisdiction over the Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1337(a), and 15 U.S.C. § 26.

9.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) and 15 U.S.C. §§ 15 and 22, as Defendants reside, transact business, committed an illegal or tortious act, have agents, and/or can be found in this District.

10.      This Court has personal jurisdiction over Defendants since they transact business in this District, and since Corteva's headquarters are located in this District and many of the decisions and policies giving rise to the claims herein occurred in this District.

## INTERSTATE COMMERCE

11.      The market for CPPs in the United States is a national market.

12.      Defendants Corteva and Syngenta sell their CPPs to wholesalers, who sell them to retailers, who sell them to farmers in all 50 states.

13.      Defendant CHS is a wholesaler and retailer that sells agricultural products including CPPs to farmers and operates in 16 states.

14.      Defendant Nutrien is a wholesaler and retailer that sells agricultural products including CPPs to farmers and operates in at least 45 states.

15.      Defendants' manufacture, distribution, and sale of CPPs involves a continuous and uninterrupted flow of commerce across state lines.

16.     Defendants' anticompetitive actions have had a substantial effect on interstate trade and commerce in the markets for the CPPs discussed herein.

**PARTIES**

17.     Plaintiff Leslie Turner ("Plaintiff") is a farmer in Anahuac, Texas who purchased CPPs from Defendant Nutrien Ag Solutions during the Class Period at prices that were artificially inflated as a result of Defendants' anticompetitive scheme, and thereby suffered antitrust injury.

18.     Defendant Corteva, Inc. ("Corteva") is a Delaware corporation based in Indianapolis, Indiana, which is in this District. In 2017, the chemical companies Dow Chemical and DuPont merged to form DowDuPont. In 2019, DowDuPont spun off its agricultural business, including CPPs, into Corteva. Corteva is involved in the research and development, manufacture, sale, and marketing of CPPs.

19.     Defendant Syngenta Crop Protection AG is a Swiss aktiengesellschaft (public limited company) based in Basel, Switzerland. China National Chemical Company (ChemChina) acquired Syngenta Crop Protection AG in 2017, and then ChemChina merged with Sinochem Group Co., Ltd. as of May 2021 to both be subsidiaries of Sinochem Holdings Corporation Ltd., which is a state-owned Chinese company based in Beijing, China. Syngenta Crop Protection AG has its North American headquarters in Greensboro, North Carolina.

20.     Defendant Syngenta Corp. is a Delaware corporation based in Wilmington, Delaware and is an affiliate of Syngenta Crop Protection AG.

21.     Defendant Syngenta Crop Protection, LLC is a Delaware LLC based in Greensboro, North Carolina and is an affiliate of Syngenta Crop Protection AG.

22.     Defendants Syngenta Crop Protection AG, Syngenta Corp. and Syngenta Crop Protection, LLC all transact substantial business in this District, and each of them is involved in the research and development, manufacture, sale, and marketing of CPPs.

23.     Defendant CHS Inc. ("CHS") is an agricultural cooperative organized in Minnesota and based in Inver Grove Heights, Minnesota. CHS transacts business in sixteen states, including Indiana, and transacts business in this District. CHS is both a wholesaler and retailer of CPPs including the Relevant CPPs (defined below).

24.     Defendant Nutrien Ag Solutions, Inc. ("Nutrien") is a Delaware corporation based in Loveland, Colorado and is a subsidiary of Canadian company Nutrien Ltd. based in Saskatoon, Saskatchewan, Canada. Nutrien transacts business in at least 45 states, including Indiana, and transacts business in this District. Nutrien is both a wholesaler and retailer of CPPs including the Relevant CPPs.

25.     John Doe Defendant Wholesalers 1-5 (together with CHS and Nutrien, the "Wholesaler Defendants") are five other major national wholesalers of CPPs, whose identity will be confirmed, who conspired with the Manufacturer Defendants to effectuate the loyalty payment scheme described herein. Certain of Wholesalers 1-5 are also major national retailers of CPPs including the Relevant CPPs.

26.     John Doe Defendant Retailers 6-10 (together with CHS and Nutrien, the "Retailer Defendants") are five other major national retailers of CPPs, whose identity will be confirmed, who conspired with the Manufacturer Defendants to effectuate the loyalty payment scheme described herein.

## CLASS ACTION ALLEGATIONS

27.    Plaintiff brings this action on behalf of himself and all others similarly situated

pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3) as a representative of a Class

defined as follows:

> All persons or entities in the United States that purchased CPPs containing
> rimsulfuron, oxamyl, or acetochlor, or CPPs containing azoxystrobin, mesotrione,
> metolachlor, or s-metolachlor, directly from CHS, Nutrien, or any other wholesaler
> or retailer that was subject to a loyalty program with Syngenta or Corteva during
> the period beginning at least as early as January 1, 2017 until such time as the
> anticompetitive conduct alleged herein has ceased (the "Class Period"). Excluded
> from the Class are (a) Defendants and their subsidiaries, affiliate entities, and
> employees, and (b) all federal or state government entities or agencies.

28.    The active ingredients rimsulfuron, oxamyl, acetochlor, azoxystrobin, mesotrione,

melolachlor, and s-melolachlor that are the subject of the loyalty programs described herein are

hereby referred to as the "Relevant AIs."

29.    CPPs manufactured by Corteva or Syngenta that contain one or more of the

Relevant AIs, and that are the subject of the loyalty programs described herein, are hereby referred

to as the "Relevant CPPs."

30.    The members of the Class are so numerous that joinder is impracticable. At least

hundreds of thousands of farms and farmers in the United States purchased the Relevant CPPs and

generic competitors to the Relevant CPPs during the Class Period.

31.    There are numerous questions of law and fact that are common to the Class and that

predominate over any issues affecting individual members of the Class, including, *inter alia*:

a.    Whether Corteva, CHS, Nutrien, Wholesalers 1-5, and Retailers 6-10

conspired to restrain trade in the markets for CPPs containing rimsulfuron, oxamyl, and

acetochlor;

b.      Whether Corteva's loyalty program was intended to exclude or minimize generic competition for CPPs containing rimsulfuron, oxamyl, and acetochlor;

c.      Whether Corteva's loyalty program did in fact exclude or minimize generic competition for CPPs containing rimsulfuron, oxamyl, and acetochlor;

d.      Whether Corteva's actions caused the retail price of CPPs containing rimsulfuron, oxamyl, and acetochlor to increase above competitive levels;

e.      Whether, after Corteva's lawfully obtained patent and regulatory exclusivities for CPPs containing each of rimsulfuron, oxamyl, and acetochlor had expired, it continued to have market power in the markets for CPPs containing each of those active ingredients;

f.      Whether, after Corteva's lawfully obtained patent and regulatory exclusivities for CPPs containing each of rimsulfuron and oxamyl had expired, it continued to have monopoly power in the markets for CPPs containing each of those active ingredients;

g.      Whether Corteva willfully acquired and maintained monopoly power in the markets for CPPs containing each of rimsulfuron and oxamyl, after its lawfully obtained patent and regulatory exclusivities on those CPPs had expired, by means of its loyalty programs;

h.      Whether Corteva's loyalty program has a legitimate pro-competitive justification;

i.      Whether the conduct alleged herein artificially maintained, preserved, or enhanced Corteva's market power in the markets for CPPs containing each of rimsulfuron, oxamyl, and acetochlor;

j.      Whether Syngenta, CHS, Nutrien, Wholesalers 1-5, and Retailers 6-10 conspired to restrain trade in the markets for CPPs containing azoxystrobin, mesotrione, and metolachlor or s-metolachlor;

k.      Whether Syngenta's loyalty program was intended to exclude or minimize generic competition for CPPs containing azoxystrobin, mesotrione, and metolachlor or s- metolachlor;

l.      Whether Syngenta's loyalty program did in fact exclude or minimize generic competition for CPPs containing azoxystrobin, mesotrione, and metolachlor or s- metolachlor;

m.      Whether Syngenta's actions caused the retail price of CPPs containing azoxystrobin, mesotrione, and metolachlor or s-metolachlor to increase above competitive levels;

n.      Whether, after Syngenta's lawfully obtained patent and regulatory exclusivities on CPPs containing each of azoxystrobin, mesotrione, and metolachlor or s-metolachlor had expired, it continued to have market power in the markets for CPPs containing each of those active ingredients;

o.      Whether after Syngenta's lawfully obtained patent and regulatory exclusivities on CPPs containing each of azoxystrobin, mesotrione, and metolachlor or s-metolachlor had expired, it continued to have monopoly power in the markets for CPPs containing each of those active ingredients;

p.      Whether Syngenta willfully acquired and maintained monopoly power in the markets for CPPs containing each of azoxystrobin, mesotrione, and metolachlor or s-

metolachlor, after its lawfully obtained patent and regulatory exclusivities on those CPPs had expired, by means of its loyalty programs;

q.    Whether Syngenta's loyalty program has a legitimate pro-competitive justification;

r.    Whether the conduct alleged herein artificially maintained, preserved, or enhanced Syngenta's market power in the markets for CPPs containing each of azoxystrobin, mesotrione, and metolachlor or s-metolachlor;

s.    Whether CHS conspired with Corteva and Syngenta to restrain generic competition in exchange for a share of Corteva and Syngenta's supracompetitive profits through loyalty payments;

t.    Whether Nutrien conspired with Corteva and Syngenta to restrain generic competition in exchange for a share of Corteva and Syngenta's supracompetitive profits through loyalty payments;

u.    Whether generic versions of CPPs containing rimsulfuron, oxamyl, and acetochlor were more expensive as a result of Defendants' anticompetitive actions as described herein;

v.    Whether generic versions of CPPs containing azoxystrobin, mesotrione, and metolachlor or s-metolachlor were more expensive as a result of Defendants' anticompetitive actions as described herein;

w.    Whether Syngenta's conduct alleged herein was a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

x.    Whether Corteva's conduct alleged herein was a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

y.      Whether CHS's conduct alleged herein was a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

z.      Whether Nutrien's conduct alleged herein was a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

aa.     Whether Syngenta's conduct alleged herein was a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

bb.     Whether Corteva's conduct alleged herein was a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

cc.     Whether Syngenta's conduct alleged herein was a violation of Section 3 of the Clayton Act, 15 U.S.C. § 14;

dd.     Whether Corteva's conduct alleged herein was a violation of Section 3 of the Clayton Act, 15 U.S.C. § 14;

ee.     Whether Syngenta's conduct alleged herein was an unreasonable restraint of trade;

ff.     Whether Corteva's conduct alleged herein was an unreasonable restraint of trade;

gg.     Whether CHS's conduct alleged herein was an unreasonable restraint of trade;

hh.     Whether Nutrien's conduct alleged herein was an unreasonable restraint of trade;

ii.     Whether Syngenta's conduct alleged herein was a *per se* violation of the federal antitrust laws;

jj.     Whether Corteva's conduct alleged herein was a *per se* violation of the federal antitrust laws;

11

kk.     Whether CHS's conduct alleged herein was a *per se* violation of the federal antitrust laws;

ll.     Whether Nutrien's conduct alleged herein was a *per se* violation of the federal antitrust laws;

mm.     The operative time period and extent of Syngenta's antitrust violations;

nn.     The operative time period and extent of Corteva's antitrust violations;

oo.     The operative time period and extent of CHS' antitrust violations;

pp.     The operative time period and extent of Nutrien's antitrust violations;

qq.     Whether Syngenta fraudulently concealed its conduct;

rr.     Whether Corteva fraudulently concealed its conduct;

ss.     Whether CHS fraudulently concealed its conduct;

tt.     Whether Nutrien fraudulently concealed its conduct;

uu.     Whether Plaintiff and members of the Class could reasonably have known about Syngenta, Corteva, CHS, and Nutrien's conduct prior to the Federal Trade Commission ("FTC") filing its complaint (the "FTC Complaint") in September 2022;

vv.     Whether the conduct alleged herein caused damages to the members of the Class in the form of overcharges paid for the Relevant CPPs and generic competitors to the Relevant CPPs, and the proper measure of such overcharge damages; and

ww.     The appropriate injunctive and equitable relief for the Class.

32.     Plaintiff's interests are typical of, and not antagonistic to, those of other or absent members of the Class, such that he can fairly and adequately represent and protect their interests.

33.     Plaintiff is represented by counsel with substantial experience litigating complex antitrust class actions.

34.     Class treatment of Plaintiff's federal antitrust claims is a superior method for the fair and efficient adjudication of this controversy in that, among other things, such treatment will permit a large number of similarly situated persons and entities to prosecute common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.

35.     Plaintiff knows of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## STATEMENT OF FACTS

## THE CROP PROTECTION INDUSTRY

**A.     The Science of Crop Protection Products.**

36.     Pesticides are chemicals used to kill or control various unwanted species that reduce crop yields. The vast majority of pesticides used in the United States are used by farmers to protect their crops, and they are called crop protection products ("CPPs").  CPPs are, therefore, crucial farm inputs that dramatically improve crop yields and quality and contribute to a stable food supply.

37.     Weeds compete with food crops for water and soil nutrients and sunlight, pests such as insects or roundworms (known by the scientific name "nematodes") eat crop plants, and crop plants can also get fungal infections. Any of those infestations can kill or reduce the growth of crop plants and reduce the resulting crop yields.

38.     CPPs target those unwanted species in order to protect food crops.  CPPs come in various types: (1) herbicides that target unwanted plants such as weeds; (2) insecticides that target insect pests; (3) nematicides that target roundworm pests; and (4) fungicides that target fungal diseases on plants.

39.     CPPs involve one or more active ingredients, which are the chemical(s) that actually kill or harm the targeted weed or pest, and then various inactive ingredients such as water, surfactants (a chemical that helps a liquid spread more easily to increase its effectiveness), or adjuvants (which can slow the drying of a liquid or improve its absorption into the crop leaves).

40.     Active ingredients differ from one another in various ways: (1) the type of pest or pests that they target; (2) their effectiveness in eliminating or controlling that pest; (3) the type of crops for which they are used; (4) the stage of the growing cycle in which they are used; and (5) how well they function under different climactic and weather conditions.

41.     The way in which a specific active ingredient kills or controls an unwanted weed or pest is known as a "mode of action." Different active ingredients will have different modes of action in terms of the chemical and biological reactions they use to target particular pests. For this reason, a generic version of a brand-name CPP that has the same active ingredients is normally a suitable substitute for that brand-name CPP, while a CPP with different active ingredients would not be.

**B.      The Manufacturers of Crop Protection Products.**

42.     Companies that manufacture CPPs can either manufacture the active ingredients internally, or can they buy the active ingredients from chemical suppliers.

43.     The companies that engage in their own research and development of active ingredients for CPPs are known as basic manufacturers. Basic manufacturers seek patent protection for the active ingredients that they develop.

44.     Defendants Corteva and Syngenta are basic manufacturers, and they are among the largest CPP manufacturers in the United States.

45.     Generic manufacturers of CPPs typically do not engage in their own research and development of active ingredients. They primarily sell CPPs using active ingredients developed by basic manufacturers for which the patent and regulatory protections have expired. There are more than twelve generic manufacturers selling CPPs in the United States.

C.     **Government Regulation of Crop Protection Products.**

46.     The federal government uses regulation and the patent system to encourage CPP manufacture in two distinct ways: (1) seeking to reward companies that create new CPPs by giving them a period of patent and regulatory exclusivity; and (2) once those periods of patent and regulatory exclusivity expire, encouraging generic manufacturers to make much less expensive versions of those CPPs. Similar to the pharmaceutical industry, this allows for a period of large profits for newly created branded CPPs that encourages continued innovation, but also makes CPPs much more affordable once those periods expire.

47.     Patent protection for a basic manufacturer developing a new CPP active ingredient lasts from the date of issuance of the patent until twenty years after the date of the patent application.

48.     The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") is a federal regulatory scheme that also seeks to reward innovation while guaranteeing the safety of CPPs. In order to sell or distribute a CPP in the United States, a manufacturer must conduct research studies about the CPP's toxicity and environmental impact, and then submit that information to the Environmental Protection Agency ("EPA"), and the EPA reviews that information prior to approving that CPP.

49.     When the EPA approves a new active ingredient for a CPP, the basic manufacturer that applied for approval of that active ingredient has a ten-year period under which other companies are not allowed to rely on the studies and data that it submitted. The effect of this is

that the basic manufacturer that obtains the approval has a ten-year exclusive period that can and often does last after the expiration of the patent.

50.     After both the patent protection and FIFRA ten-year period on an active ingredient have expired, a generic manufacturer can get approvals to enter the market by using the same data that the basic manufacturer originally submitted. This is a much faster and easier and cheaper process than a company having to conduct its own research studies.

### D.     The Distribution Chain for Crop Protection Products.

51.     CPP manufacturers sell their CPPs to wholesalers.

52.     CPP wholesalers either own retail outlets in farming communities around the country, and/or they sell CPPs to retail chains and independent retailers in farming communities around the country.

53.     CHS and Nutrien are both wholesalers and retailers of CPPs.

54.     Farms and farmers then buy CPPs from those retail outlets, including CHS and Nutrien and other Retailer Defendants.

55.     This "traditional" distribution channel is responsible for about 90% of all sales of CPPs in the United States.

56.     The seven largest wholesalers, including CHS and Nutrien, are responsible for about 90% of all sales of CPPs in the United States through the traditional distribution channel, and so they are responsible for about 80% of the total sales of CPPs in the United States.

57.     The wholesalers are by far the best way for a CPP manufacturer to reach the target market of farmers.  A CPP manufacturer only has to sell through a few large wholesalers to access a large percentage of all retail outlets serving the vast majority of American farmers. The wholesalers either own their own retail stores or have longstanding relationships with retailers that

facilitate their sales of CPPs, and they have a massive infrastructure to support their distribution and sales of CPPs, including logistics, storage facilities, financing, and promotions. CPP manufacturers would encounter huge difficulties and costs trying to develop those capabilities on their own, and it would be far less efficient for them to try to sell directly to retailers or farmers.

  **E.**  **Generic Entry and Life Cycle Management.**

  58.  Once the patent and regulatory exclusivity for a basic manufacturer's branded CPP expire, market entry of generic versions of that CPP is normally associated with active competition between many manufacturers that results in far lower prices. This vastly reduces the profit that the basic manufacturer can make from that CPP after that expiration date.

  59.  Brand manufacturers engage in corporate strategy planning called "life cycle management" for a branded CPP. This can be done in a perfectly legal and pro-competitive manner, such as determining how a CPP's pricing should change, and the promotional expenses that should be devoted to that CPP, at different points in its exclusivity period. However, it can also involve anticompetitive methods designed to prevent or delay generic entry or prevent generic entrants from being able to access the market effectively.

<strong>DEFENDANTS' ANTICOMPETIVE CONDUCT</strong>

  60.  Corteva and Syngenta each use "loyalty programs" for their wholesalers that are designed to prevent generic competitors from accessing much of the market for CPPs.

  61.  The Manufacturer Defendants' loyalty programs were established with the intention of maintaining monopoly or near-monopoly exclusivity for their CPPs even after the patent and regulatory protection on those CPPs expired.

62.    The loyalty programs involve a Manufacturer Defendant making large payments to CHS, Nutrien, or another wholesaler or retailer that agreed to strictly limit its purchases of certain generic CPPs that would compete with the Manufacturer Defendant's CPPs that have lost patent and regulatory protection. These large "bonus" payments are a conduit for the Manufacturer Defendants to share monopoly profits with the Wholesaler Defendants and Retailer Defendants in order to secure their cooperation with the scheme described herein.

63.    The loyalty programs have in fact achieved those goals.  Generic competition for the Relevant CPPs has been greatly inhibited due to the Manufacturer Defendants using loyalty programs to get CHS, Nutrien, and other wholesalers and retailers to exclude or minimize the distribution and sale of generic versions of the Relevant CPPs.

64.    Further, those small quantities of generic versions of the Relevant CPPs that are still able to be sold are significantly more expensive, due to the fact that output in those markets is significantly restricted and prices are artificially higher as a result, allowing generic manufacturers to price their products significantly higher than they would in the event of open competition.

**A.    Corteva's Loyalty Program.**

65.    Corteva's loyalty program is intended to, and does in fact, exclude or minimize generic competition for Corteva CPPs that have lost patent and regulatory exclusivity.

66.    Under Corteva's loyalty program, wholesalers must make a very high percentage of their purchases of each of those CPPs from Corteva to receive loyalty payments, thereby causing them to limit their purchases of competing generic versions of those CPPs to a very low percentage share of their overall purchases of those CPPs.

67.    As a result of excluding or minimizing generic competition, Corteva is able to continue to charge high prices for its CPPs even after they have lost patent and regulatory

exclusivity, and still maintain high market share, allowing it to gain supracompetitive profits that it would not receive if there was open competition with generic competitors across the distribution chain.

68.     Corteva uses these incentive payments to wholesalers (including wholesalers who operate retail outlets, such as CHS and Nutrien) to encourage the cooperation of wholesalers in this scheme, sharing part of its supracompetitive profits with them in exchange for their role in excluding generic competition and allowing those supracompetitive profits to continue.

**B.     Syngenta's Key AI Loyalty Program.**

69.     Syngenta's loyalty program is called the "Key AI" program.

70.     Syngenta allows both wholesalers and retailers to participate in the Key AI program.

71.     The Key AI program is intended to, and does in fact, exclude or minimize generic competition for Syngenta CPPs that have lost patent and regulatory exclusivity.

72.     Under the Key AI program, wholesalers and retailers must make a very high percentage of their purchases of each of those CPPs to be Syngenta's branded CPPs to receive loyalty payments, thereby causing them to limit their purchases of competing generic versions of those CPPs to a very low percentage share of their overall purchases of those CPPs.

73.     As a result of excluding or minimizing generic competition, Syngenta is able to continue to charge high prices for its CPPs even after they have lost patent and regulatory exclusivity, and still maintain high market share, allowing it to gain supracompetitive profits that it would not receive if there was open competition with generic competitors across the distribution chain.

74.     Syngenta uses these incentive payments to wholesalers and retailers to encourage the cooperation of wholesalers and retailers in this scheme, sharing part of its supracompetitive profits with them in exchange for their role in excluding generic competition and allowing those supracompetitive profits to continue.

**C.      Market Effects of Loyalty Programs.**

75.     Corteva and Syngenta have entered into loyalty agreements with all major wholesalers of CPPs in the United States, including CHS, Nutrien, Wholesalers 1-5, and in Syngenta's case, also Retailers 6-10.  Corteva has entered into loyalty agreements with major wholesalers that are also major national retailers of CPPs, including CHS and Nutrien.

76.     Since the major wholesalers have such a large market share of the traditional distribution channel and thereby control a very large share of all sales of CPPs to farmers, this gives Corteva and Syngenta's loyalty agreements a substantial marketwide effect and serves to greatly restrict competition for the Relevant CPPs, resulting in higher prices for farmers and increased profits for Corteva and Syngenta.

77.     The fact that the major wholesalers know that all of their competitors participate in these loyalty programs means that each major wholesaler knows that no one wholesaler will want to leave the loyalty program agreements and sell lower priced generics instead, because this would undermine the entire scheme and jeopardize the large profits that the wholesalers obtain from the loyalty programs.

78.     Since the loyalty program requirements are typically that the wholesaler must purchase a very high share of its CPPs containing a particular Relevant AI from Corteva or Syngenta or risk losing a very large incentive payment, wholesalers often avoid any risk of missing

20

the required share by not dealing with generic competitors at all, or by minimizing their purchases and interactions with them and their promotion of generic products.

79.     Since the loyalty program requirements are typically that the retailer must purchase a very high share of Syngenta CPPs out of its total purchases of CPPs containing a particular Relevant AI or risk losing a very large incentive payment, retailers often avoid any risk of missing the required share by not dealing with generic competitors at all, or by minimizing their purchases and interactions with them and their promotion of generic products.

80.     Further, those small quantities of generic versions of the Relevant CPPs that are still able to be sold are significantly more expensive, due to the fact that output in those markets is significantly restricted and prices are artificially higher as a result, allowing generic manufacturers to price their products significantly higher than they would in the event of open competition.

**D.     Corteva CPPs Subject to Corteva's Loyalty Program.**

81.     Corteva's loyalty program includes CPPs using three specific active ingredients for which patent and regulatory exclusivities have expired: rimsulfuron, oxamyl, and acetochlor.

82.     Rimsulfuron is an herbicide that is used to hinder weed growth in various types of crop fields.

83.     After Corteva's patent and regulatory exclusivity for rimsulfuron expired, generic manufacturers introduced generic versions of CPPs containing rimsulfuron that were priced significantly lower than Corteva's branded versions.

84.     However, due to Corteva's loyalty program, the generic manufacturers are not able to gain any significant market share in the market for CPPs containing rimsulfuron, despite their products having the same active ingredient(s) and being much less expensive.

85.     In order to meet the loyalty program's share requirement and continue to receive large incentive payments, wholesalers strictly limit purchases of CPPs containing generic rimsulfuron or do not purchase generics at all, they do not promote generic CPPs containing rimsulfuron, and they encourage their customers to buy Corteva's CPPs containing rimsulfuron rather than competing generic versions.

86.     This has effectively minimized generic competition for Corteva in the market for CPPs containing rimsulfuron.

87.     This greatly reduced competition has resulted in much higher profits for Corteva from CPPs containing rimsulfuron than it would receive in the absence of its anticompetitive loyalty program if there was open competition from generics across the distribution chain.

88.     Oxamyl is an insecticide and nematicide used to control pests in various crop fields, particularly cotton fields and fruit and vegetable fields.

89.     After Corteva's patent and regulatory exclusivity for oxamyl expired, generic manufacturers introduced generic versions of CPPs containing oxamyl that were priced significantly lower than Corteva's branded versions.

90.     However, due to Corteva's loyalty program, the generic manufacturers are not able to gain any significant market share in the market for CPPs containing oxamyl, despite their products having the same active ingredient and being much less expensive.

91.     In order to meet the loyalty program's share requirement and continue to receive large incentive payments, wholesalers strictly limit purchases of generic CPPs containing oxamyl or do not purchase generics at all, they do not promote generic CPPs containing oxamyl, and they encourage their customers to buy Corteva's CPPs containing oxamyl rather than competing generic versions.

22

92.    This has effectively minimized generic competition for Corteva in the market for CPPs containing oxamyl.

93.    This greatly reduced competition has resulted in much higher profits for Corteva from CPPs containing oxamyl than it would receive in the absence of its anticompetitive loyalty program if there was open competition from generics across the distribution chain.

94.    Acetochlor is an herbicide that inhibits weed growth particularly in corn fields, but also in fields of crops such as soybeans and sugar beets.

95.    Corteva and Bayer are partners in a joint venture that owns the U.S. registration for acetochlor, Bayer does the actual manufacturing of acetochlor, and Corteva sells CPPs containing acetochlor that are subject to loyalty program agreements as described herein.

96.    After Corteva and Bayer's patent and regulatory exclusivity for acetochlor expired, generic manufacturers introduced generic versions of CPPs containing acetochlor that were priced significantly lower than Corteva's branded versions.

97.    However, due to Corteva's loyalty program, the generic manufacturers are not able to gain any significant market share in the market for CPPs containing acetochlor, despite their products having the same active ingredient(s) and being much less expensive.

98.    In order to meet the loyalty program's share requirement and continue to receive large incentive payments, wholesalers strictly limit purchases of generic CPPs containing acetochlor or do not purchase generics at all, they do not promote generic CPPs containing acetochlor, and they encourage their customers to buy Corteva CPPs containing acetochlor rather than competing generic versions.

99.     This has effectively minimized generic competition for Corteva in the market for CPPs containing acetochlor and has also caused generic manufacturers to postpone or cancel introducing CPPs containing acetochlor to the United States market.

100.     This greatly reduced competition has resulted in much higher profits for Corteva from CPPs containing acetochlor than it would receive in the absence of its anticompetitive loyalty program if there was open competition from generics across the distribution chain.

101.     CHS and Nutrien and other Wholesaler Defendants and Retailer Defendants have received loyalty payments from Corteva as a result of their cooperation with Corteva's restraint of trade, and CHS and Nutrien and other Wholesaler Defendants and Retailer Defendants have thereby profited from their willing participation in Corteva's scheme.

**E.     Syngenta CPPs Subject to the Key AI Loyalty Program.**

102.     Syngenta's Key AI loyalty program includes CPPs containing three active ingredients for which patent and regulatory exclusivities have expired: azoxystrobin, mesotrione, and metolachlor (and s-metolachlor, as will be explained below).

103.     Azoxystrobin is a fungicide that is used to kill and control fungal diseases on crops.

104.     After Syngenta's patent and regulatory exclusivity for azoxystrobin expired, generic manufacturers introduced generic versions of CPPs containing azoxystrobin that were priced significantly lower than Syngenta's branded versions.

105.     However, due to Syngenta's loyalty program, the generic manufacturers are not able to gain any significant market share in the market for CPPs containing azoxystrobin, despite their products having the same active ingredient(s) and being much less expensive.

106.     In order to meet the loyalty program's share requirement and continue to receive large incentive payments, wholesalers and retailers strictly limit purchases of generic CPPs

containing azoxystrobin or do not purchase generics at all, they do not promote generic CPPs containing azoxystrobin, and they encourage their customers to buy Syngenta's CPPs containing azoxystrobin rather than competing generic versions.

107.    This has effectively minimized generic competition for Syngenta in the market for CPPs containing azoxystrobin and has also caused at least one generic manufacturer to not introduce an azoxystrobin product to the United States market.

108.    This greatly reduced competition has resulted in much higher profits for Syngenta from CPPs containing azoxystrobin than it would receive in the absence of its anticompetitive loyalty program if there was open competition from generics across the distribution chain.

109.    Mesotrione is an herbicide that controls common weeds in corn fields.

110.    After Syngenta's patent and regulatory exclusivity for mesotrione expired, generic manufacturers introduced generic versions of CPPs containing mesotrione that were priced significantly lower than Syngenta's branded versions.

111.    However, due to Syngenta's loyalty program, the generic manufacturers are not able to gain any significant market share in the market for CPPs containing mesotrione, despite their products having the same active ingredient(s) and being much less expensive.

112.    In order to meet the loyalty program's share requirement and continue to receive large incentive payments, wholesalers and retailers strictly limit purchases of generic CPPs containing mesotrione or do not purchase generics at all, they do not promote generic CPPs containing mesotrione, and they encourage their customers to buy Syngenta's CPPs containing mesotrione rather than competing generic versions.

113.    This has effectively minimized generic competition for Syngenta in the market for CPPs containing mesotrione and has also caused at least two generic manufacturers to postpone or cancel introducing a mesotrione product to the United States market.

114.    This greatly reduced competition has resulted in much higher profits for Syngenta from CPPs containing mesotrione than it would receive in the absence of its anticompetitive loyalty program if there was open competition from generics across the distribution chain.

115.    According to the FTC Complaint, following expiration of the patent and regulatory exclusivity terms protecting mesotrione, in addition to facing a threat from generic manufacturers, Syngenta also faced a threat from Corteva. A Corteva predecessor company developed a mixture product containing mesotrione, along with two other active ingredients.  Upon information and belief, together with the Manufacturing Defendants' other anticompetitive conduct, further conduct also harmed competition in CPPs containing mesotrione.[1]

116.    Metolachlor is an herbicide that controls common weeds in various crop fields, including corn, soybeans, and sorghum.

117.    Products containing "metolachlor" contains a 50-50 mixture of s-metolachlor and r-metolachlor, which have identical molecular makeups but are arranged differently (similar to a left and right glove).  Syngenta's CPPs contain predominantly s-metolachlor (88% s-metolachlor and 12% r-metolachlor).  CPPs using predominantly s-metolachlor are far more effective at killing weeds than CPPs that use the mixed version of metolachlor.

118.    After Syngenta's patent and regulatory exclusivity for metolachlor expired, generic manufacturers introduced generic versions of CPPs containing metolachlor that were priced significantly lower than Syngenta's branded versions.

_____

[1] Plaintiff alleges these facts based upon information made public in the FTC's recent action filed against the Manufacturing Defendants. The details of the additional conduct relating to mesotrione are redacted from public filing.

119.    After Syngenta's patent and regulatory exclusivity for s-metolachlor expired, generic manufacturers introduced generic versions of CPPs containing s-metolachlor that were priced significantly lower than Syngenta's branded versions.

120.    However, due to Syngenta's loyalty program, the generic manufacturers are not able to gain any significant market share in the markets for CPPs containing metolachlor and s-metolachlor, despite their products having the same active ingredient(s) and being much less expensive.

121.    In order to meet the loyalty program's share requirement and continue to receive large incentive payments, wholesalers and retailers strictly limited purchases of generic CPPs containing metolachlor or do not purchase generics at all, they do not promote generic CPPs containing metolachlor, and they encouraged their customers to buy Syngenta's CPPs containing metolachlor rather than competing generic versions.

122.    In order to meet the loyalty program's share requirement and continue to receive large incentive payments, wholesalers and retailers strictly limit purchases of generic CPPs containing s-metolachlor or do not purchase generics at all, they do not promote generic CPPs containing s-metolachlor, and they encourage their customers to buy Syngenta's CPPs containing s-metolachlor rather than competing generic versions.

123.    This has effectively minimized generic competition for Syngenta in the market for CPPs containing metolachlor and s-metolachlor, and it has also caused generic manufacturers to postpone or cancel introducing metolachlor products to the United States market.

124.    This greatly reduced competition has resulted in much higher profits for Syngenta from CPPs containing metolachlor and s-metolachlor than it would receive in the absence of its anticompetitive loyalty program if there was open competition from generics across the distribution chain.

125.   CHS and Nutrien and other Wholesaler Defendants and Retailer Defendants have received loyalty payments from Syngenta as a result of their cooperation with Syngenta's restraint of trade, and CHS and Nutrien and other Wholesaler Defendants and Retailer Defendants have thereby profited from their willing participation in Syngenta's scheme.

## RELEVANT MARKETS

126.   At all relevant times, Corteva had market power and monopoly power in the markets for CPPs containing rimuslfuron and oxamyl, and market power in the market for CPPs containing acetochlor.   Corteva had the power to maintain the price of those CPPs at supracompetitive levels profitably without losing substantial sales to other products used for the same purposes as each of those CPPs.

127.   At all relevant times, Syngenta had market power and monopoly power in the markets for CPPs containing azoxystrobin, mesotrione, metolachlor, and s-metolachlor.   Syngenta had the power to maintain the price of those CPPs at supracompetitive levels profitably without losing substantial sales to other products used for the same purposes as each of those CPPs.

128.   To the extent Plaintiff's claims require the definition of a relevant market, the relevant product markets are the markets for EPA-registered CPPs for sale in the United States that contain each of the specific Relevant AIs.   For example, for the Relevant AI azoxystrobin, the relevant product market is the market for EPA-registered CPPs for sale in the United States that contain azoxystrobin, and it would include Syngenta's CPPs containing azoxystrobin and any generic versions of those CPPs.

129.   To the extent Plaintiff's claims require the definition of a relevant market, the relevant geographic market is the United States. The EPA has to approve CPPs for sale and use in the United States, and farmers in the United States are not allowed to legally use CPPs from other countries that have not been approved for sale and use in the United States. Therefore, the price of

CPPs in other countries does not affect the market for CPPs in the United States.

130.    The Manufacturer Defendants have a very high market share in the markets for CPPs containing each of the Relevant AIs, despite the fact that those CPPs do not currently possess patent and regulatory exclusivities.  There are significant barriers to entry for generic manufacturers being able to enter the market for any CPP, in addition to patent and regulatory barriers, including the need for EPA registration, access to supplies of active and inactive ingredients, manufacturing facilities and know-how, and the ability to distribute products effectively.  Defendants' actions have also created further effective barriers to entry for generic competitors for the Relevant CPPs that prevents them from accessing the traditional distribution channel and being able to compete effectively in those markets.

131.    For each of the Relevant CPPs, its only reasonable substitute is a generic version of that Relevant CPP.  Other CPPs with different active ingredients will affect different types of weeds or pests, be suitable for different climate and weather conditions or types of crop fields, and/or have different modes of action in terms of the chemical and biological reactions they use to target particular weeds or pests and therefore would obtain different results than the particular Relevant CPP in question.

132.    Azoxystrobin is differentiated from other CPPs used for similar purposes in that it can be used with all major row crops, making application easier, and it also is claimed to have growth-promoting effects on crops.

133.    Mesotrione is differentiated from other CPPs used for similar purposes due to its greater efficacy and crop safety and lower use rate than other CPPs.

134.    Metolachlor is differentiated from other CPPs used for similar purposes due to its greater solubility in water (which improves its performance in drier conditions), its better performance in warmer conditions, and its ability to be used with a wider variety of crop fields.

135.    S-metolachlor shares the advantages of metolachlor but has even greater efficacy in killing weeds.

136.    Rimsulfuron is differentiated from other CPPs used for similar purposes due to the fact that it affects more different types of weeds, it can be used with a wider variety of crop fields, and it can be used preemptively to prevent weed growth as well to control an existing weed problem.

137.    Oxamyl is differentiated from other CPPs used for similar purposes in that it has less risks to crops or soil health, and it can be applied directly onto crops instead of applied at root level or in the soil.

138.    Acetochlor is differentiated from other CPPs used for similar purposes due to its superior performance in wetter or cooler conditions, its greater efficacy against particular types of weeds, and its greater efficacy earlier in the growing season.

139.    A small but significant and non-transitory artificial inflation of the price of any of the Relevant CPPs would not cause any significant number of consumers to purchase CPPs with different active ingredients so as to make such price inflation unprofitable. A small but significant and non-transitory artificial inflation of the price of any CPPs with different active ingredients than the Relevant CPPs would not cause any significant number of consumers to purchase the Relevant CPPs instead so as to make the artificial price inflation unprofitable.

**ANTITRUST INJURY**

140.    Defendants Corteva and Syngenta's loyalty programs were intended to, and did in fact, exclude or minimize generic competition for the Relevant CPPs.

141.    Due to Corteva and Syngenta's loyalty programs excluding or minimizing generic competition for each of the Relevant CPPs, and doing so with the cooperation of the Wholesaler Defendants and Retailer Defendants, Plaintiff and other members of the proposed Class have had

to pay and continue to pay artificially inflated prices for each of those Relevant CPPs and for their generic competitors as compared to the prices that would exist absent those loyalty programs if there was open competition from generic competitors across the distribution chain.  This injury is ongoing.

142.    Plaintiff and other members of the proposed Class have sustained substantial losses and damage to their business and property in the form of those overcharges on their purchases of Relevant CPPs and their generic competitors.  The full amount, forms, and components of such damages will be determined after discovery and upon proof at trial.

143.    The prices of the Relevant CPPs and their generic competitors have been, and will continue to be, artificially inflated as a result of the Defendants' anticompetitive conduct.  The inflated prices that the Plaintiff and other members of the proposed Class have paid for the Relevant CPPs and their generic competitors, and will continue to pay until Defendants' conduct ceases, are the foreseeable result of Defendants' anticompetitive conduct.

**CONTINUING VIOLATIONS AND FRAUDULENT CONCEALMENT**

144.    A cause of action accrued for Plaintiff each time Plaintiff bought one of the Relevant CPPs or its generic competitors at a supracompetitive price caused by the Manufacturer Defendants' loyalty program scheme and the Wholesaler Defendants and Retailer Defendants' cooperation in that scheme. And each sale of a Relevant CPP or its generic competitor at a supracompetitive price caused by the Manufacturer Defendants' loyalty program scheme and the Wholesaler Defendants and Retailer Defendants' cooperation in that scheme constituted another overt act in furtherance of their anticompetitive scheme. Accordingly, even though certain of the loyalty programs described herein were entered into more than four years prior to the filing of this

lawsuit, Plaintiff is entitled to recover all damages on all purchases by Plaintiff of Corteva or Syngenta's Relevant CPPs or their generic competitors at supracompetitive prices within four years of the filing of this lawsuit.

145.    Due to Defendants' concealment of their unlawful conduct, however, Plaintiff and members of the Class are entitled to recover damages reaching back even beyond four years of the filing of this complaint. That Corteva and Syngenta entered into loyalty programs with CHS, Nutrien, Wholesalers 1-5 and Retailers 6-10 was not discoverable until after the FTC filed the FTC Complaint against Corteva and Syngenta in September 2022.  Plaintiff and members of the Class had no knowledge of the Defendants' unlawful, self-concealing scheme and could not have discovered the scheme and conspiracy through the exercise of reasonable diligence more than four years before the filing of this complaint.

146.    This is true because of the nature of the Defendants' scheme was self-concealing and because the Defendants employed deceptive tactics and techniques of secrecy to avoid detection of, and to conceal, their contracts, combinations, conspiracy and scheme.

147.    The Defendants wrongfully and affirmatively concealed the existence of their ongoing combination and conspiracy from Plaintiff and members of the Class by, among other things, Corteva and Syngenta entering into contracts with wholesalers and retailers that were not publicly disclosed, and failing to disclose the means of operation of these loyalty programs in legally mandated public disclosure documents, such as Corteva and Syngenta's SEC filings.

148.    Because the scheme and conspiracy were both self-concealing and affirmatively concealed by the Defendants, Plaintiff and members of the Class had no knowledge of the scheme and conspiracy more than four years before the filing of this complaint; nor did they have the facts

or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed.

149.    Plaintiff and members of the Class also lacked the facts and information necessary to form a good faith basis for believing that any legal violations had occurred. Reasonable diligence on the part of Plaintiff and members of the Class would not have uncovered those facts more than four years before the filing of this complaint.

150.    As a result of the Defendants' fraudulent concealment, all applicable statutes of limitations affecting the Plaintiff's and Class members' claims have been tolled.

## CLAIMS FOR RELIEF

### COUNT ONE – VIOLATION OF § 1 OF THE SHERMAN ACT (15 U.S.C. § 1)
### (Against All Defendants)

151.    Plaintiff hereby restates and incorporates the preceding paragraphs as if fully set forth herein.

152.    Defendants Corteva, Syngenta, the Wholesaler Defendants, and the Retailer Defendants violated Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, by Corteva and Syngenta entering into unlawful loyalty program agreements with the Wholesaler Defendants and Retailer Defendants that were intended to, and did in fact, restrain generic competition in the markets for the Relevant CPPs.

153.    Defendants' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 injured the Plaintiff in his business or property. The injuries of Plaintiff and members of the Class consist of having paid higher prices for the Relevant CPPs and generic versions of the Relevant CPPs than they would have paid in the absence of those violations. Such injury, called

"overcharges," is of the type that the antitrust laws were designed to prevent, and it flows from that which makes Defendants' conduct unlawful.

154.    At all relevant times, Defendants Corteva and Syngenta possessed market power in the relevant market for each of the Relevant CPPs.  But for Defendants' wrongful conduct, as alleged herein, open competition from generic manufacturers of each of those Relevant CPPs would have greatly reduced prices at all points along the distribution chain, including the retail prices paid by Plaintiff and members of the Class.

155.    Defendants Corteva and Syngenta entered into loyalty payment agreements with the Wholesaler Defendants and Retailer Defendants under which Corteva and Syngenta made large payments to the Wholesaler Defendants and Retailer Defendants in exchange for those wholesalers and retailers agreeing to minimize their purchases and sales of generic competitors to Relevant CPPs made by Corteva and Syngenta. Corteva and Syngenta entered into these agreements in order to, and did in fact, unreasonably restrain trade in the markets for each of the Relevant CPPs, the purpose and effect of which was to: (a) prevent generic competitors for the Relevant CPPs from being able to access large parts of the market; and (b) allow their own branded Relevant CPPs to be sold at significantly higher prices and still maintain most of the market share, thereby artificially increasing the prices that Plaintiff and other members of the Class would pay for each of the Relevant CPPs. Corteva and Syngenta used the loyalty programs to divert a portion of their supracompetitive profits from this restraint of trade and resulting higher prices and sales to the Wholesaler Defendants and Retailer Defendants in order to obtain their cooperation with the scheme.

156.    There is and was no legitimate, non-pretextual, pro-competitive business justification for Defendants' conduct that outweighs its harmful effect on purchasers and

competition. Defendants' conduct can only be explained by anticompetitive motives and a desire to foreclose competition in the markets for the Relevant CPPs. Even if there were some conceivable and cognizable justification, Defendants' loyalty program agreements were not necessary to achieve such a purpose. Any supposed procompetitive benefits are false and pretextual and/or could have been achieved in a less restrictive manner.

157.    Further, those small quantities of generic versions of the Relevant CPPs that are still able to be sold are significantly more expensive, due to the fact that output in those markets is significantly restricted and prices are artificially higher as a result, allowing generic manufacturers to price their products significantly higher than they would in the event of open competition.

158.    As a direct and proximate result of Defendants' anticompetitive conduct involving the loyalty program agreements described herein, Plaintiff and members of the Class were harmed.

159.    As a direct, material, and proximate result of Defendants' violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Plaintiff and members of the Class have suffered injury to their business or property within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15(a), throughout the Class Period.

160.    Plaintiff and members of the Class are entitled to treble damages for Defendants' violations of Section 1 of the Sherman Antitrust Act, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

161.    Defendants' unlawful conduct continues and, unless restrained, will continue. Unless and until the activities complained of are enjoined, Plaintiff and members of the Class will suffer immediate and irreparable injury for which they are without an adequate remedy at law. Plaintiff and members of the Class are also entitled to an injunction against Defendants preventing and restraining further violations, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

**COUNT TWO – VIOLATION OF § 2 OF THE SHERMAN ACT (15 U.S.C. § 2)**
**MONOPOLIZATION**
**(Against Corteva)**

162.    Plaintiff repeats and reiterates each of the allegations contained in the paragraphs above as if fully set forth herein.

163.    The relevant product markets are the market for EPA-registered CPPs for sale in the United States that contain rimsulfuron, and the market for EPA-registered CPPs for sale in the United States that contain oxamyl. The relevant geographic market is the United States.

164.     As a result of the scheme alleged herein, Corteva possesses monopoly power in the market for EPP-registered CPPs for sale in the United States that contain rimsulfuron, and the market for EPP-registered CPPs for sale in the United States that contain oxamyl.

165.    Corteva willfully maintained its monopoly power in those markets even after its patent and regulatory exclusivities expired by means of the loyalty program scheme described herein, under which it made large payments to the Wholesaler Defendants and the Retailer Defendants in exchange for those wholesalers and retailers agreeing to minimize their purchases and sales of generic competitors to Corteva's CPPs containing rimsulfuron and oxamyl.

166.    Corteva's actions were carried out willfully and with the specific intent to maintain its monopoly power in those markets through anticompetitive conduct and not through a superior product, business acumen, or a historic accident.

167.    The direct, foreseeable, and proximate result of Corteva's anticompetitive conduct was to increase prices and harm competition in those markets.

168.    There is no legitimate pro-competitive justification for Corteva's conduct, and even if there were, there would be less restrictive alternatives to achieve them.

169.    As a direct, material, and proximate result of Corteva's violation of § 2 of the Sherman Act, Plaintiff and the Class have suffered injury to their business and property within the meaning of § 4 of the Clayton Act throughout the Class Period.

170.    Plaintiff and the Class seek treble damages for Corteva's violations of § 2 of the Sherman Act under § 4 of the Clayton Act.

171.    Plaintiff and the Class also seek an injunction against Corteva, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## COUNT THREE – VIOLATION OF § 2 OF THE SHERMAN ACT (15 U.S.C. § 2) MONOPOLIZATION
### (Against Syngenta)

172.    Plaintiff repeats and reiterates each of the allegations contained in the paragraphs above as if fully set forth herein.

173.    The relevant product markets are the market for EPA-registered CPPs for sale in the United States that contain azoxystrobin, the market for EPA-registered CPPs for sale in the United States that contain mesotrione, the market for EPA-registered CPPs for sale in the United States that contain metolachlor, and the market for EPA-registered CPPs for sale in the United States that contain s-metolachlor. The relevant geographic market is the United States.

174.    As a result of the scheme alleged herein, Syngenta possesses monopoly power in each of those markets.

175.    Syngenta willfully maintained its monopoly power in those markets even after its patent and regulatory exclusivities expired by means of the loyalty program scheme described herein, under which it made large payments to the Wholesaler Defendants and the Retailer Defendants in exchange for those wholesalers and retailers agreeing to minimize their purchases

and sales of generic competitors to Syngenta's CPPs containing azoxystrobin, mesotrione, metolachlor, and s-metolachlor.

176.    Syngenta's actions were carried out willfully and with the specific intent to maintain its monopoly power in those markets through anticompetitive conduct and not through a superior product, business acumen, or a historic accident.

177.    The direct, foreseeable, and proximate result of Syngenta's anticompetitive conduct was to increase prices and harm competition in those markets.

178.    There is no legitimate pro-competitive justification for Syngenta's conduct, and even if there were, there would be less restrictive alternatives to achieve them.

179.    As a direct, material, and proximate result of Syngenta's violation of § 2 of the Sherman Act, Plaintiff and the Class have suffered injury to their business and property within the meaning of § 4 of the Clayton Act throughout the Class Period.

180.    Plaintiff and the Class seek treble damages for Syngenta's violations of § 2 of the Sherman Act under § 4 of the Clayton Act.

181.    Plaintiff and the Class also seek an injunction against Syngenta, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## COUNT FOUR – VIOLATION OF § 3 OF THE CLAYTON ACT (15 U.S.C. § 14)
### (Against Sygenta and Corteva)

182.    Pursuant to the Manufacturer Defendants' unlawful loyalty program agreements, they provided payments in the form of rebates to Wholesaler and Retailer Defendants in exchange for their agreement or understanding not to use or deal in the goods of the Manufacturer Defendants' generic competitors. This conduct substantially lessened competition and created monopolies in the Relevant CPPs, in violation of Section 3 of the Clayton Act (15 U.S.C. § 14).

183.    As a result, generic competition to the Relevant CPPs was substantially restrained

and the Manufacturer Defendants unlawfully maintained monopolies in the Relevant CPPs.

184.    This conduct caused Plaintiffs and Class Members to pay higher prices for the Relevant CPPs than they would have paid in the absence of the Manufacturer Defendants' agreements with Wholesaler and Retailer Defendants.

185.    Plaintiffs and the Class Members were injured and damaged because they purchased the Relevant CPPs at supracompetitive prices caused by the Manufacturer Defendants' violations of Section 3 of the Clayton Act.

186.    Plaintiffs and members of the Class have no adequate remedy at law to prevent Defendants' ongoing and future anticompetitive conduct and therefore seek an injunction to prevent them from continuing to engage in such conduct.

WHEREFORE, Plaintiff demands a trial by jury and hereby respectfully requests:

(a)    That the Court determine that Plaintiff's claim regarding the Class alleged herein is suitable for class treatment and certify the proposed Class pursuant to Fed. R. Civ. P. 23;

(b)    That the Court appoint Plaintiff as the representative of the Class;

(c)    That the Court appoint Plaintiff's counsel as counsel for the Class;

(d)    That the Court adjudge and decree that Defendants have combined and conspired in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and that Plaintiffs and the Class have been injured in their business and property as a result of Defendants' violations;

(e)    That the Court enter judgment in favor of Plaintiff and the Class and against the Defendants for violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, jointly and severally;

(f)    That the Court adjudge and decree that Corteva has violated Section 2 of the Sherman Act, 15 U.S.C. § 2, and that Plaintiffs and the Class have been injured in their business and property as a result of Corteva's violations;

(g)    That the Court enter judgment in favor of Plaintiff and the Class and against Corteva

for violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

(h)    That the Court adjudge and decree that Syngenta has violated Section 2 of the Sherman Act, 15 U.S.C. § 2, and that Plaintiffs and the Class have been injured in their business and property as a result of Syngenta's violations;

(i)    That the Court enter judgment in favor of Plaintiff and the Class and against Syngenta for violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

(j)    That the Court adjudge and decree that Corteva has violated Section 3 of the Clayton Act, 15 U.S.C. § 14, and that Plaintiffs and the Class have been injured in their business and property as a result of Corteva's violations;

(k)    That the Court enter judgment in favor of Plaintiff and the Class and against Corteva for violation of Section 3 of the Clayton Act, 15 U.S.C. § 14;

(l)    That the Court adjudge and decree that Syngenta has violated Section 3 of the Clayton Act, 15 U.S.C. § 14, and that Plaintiffs and the Class have been injured in their business and property as a result of Syngenta's violations;

(m)    That the Court enter judgment in favor of Plaintiff and the Class and against Syngenta for violation of Section 3 of the Clayton Act, 15 U.S.C. § 14;

(n)    That the Court award, pursuant to 15 U.S.C. § 15, compensatory and trebled damages to the Class resulting from Defendants' violations of the Sherman Act and the Clayton Act;

(o)    That the Court order, pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing Defendants from continuing their unlawful acts in violation of the Sherman Act and the Clayton Act;

(p)    That Plaintiff and the Class be awarded their costs, expenses, and reasonable attorney's fees in bringing this action;

(q)     That Plaintiff and the Class be awarded pre-judgment and post-judgment interest on all sums awarded; and

(r)     Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all issues properly triable to a jury in this case.

Dated:  December 15, 2022                              Respectfully submitted,

                                                       /s/ *Michelle C. Clerkin*

                                                       Shomik Ghosh (*pro hac vice* forthcoming)
                                                       Michelle C. Clerkin (*pro hac vice*)
                                                       **SPIRO HARRISON & NELSON**
                                                       7 World Trade Center, 46th Floor
                                                       250 Greenwich Street
                                                       New York, NY 10007
                                                       Phone: (646) 880-8850
                                                       Fax: (973) 232-0887
                                                       sghosh@spiroharrison.com
                                                       mclerkin@spiroharrison.com

                                                       Jason C. Spiro (*pro hac vice* forthcoming)
                                                       **SPIRO HARRISON & NELSON**
                                                       2 Bridge Avenue, Ste. 322
                                                       Red Bank, NJ 07701
                                                       Phone: (862) 341-4804
                                                       Fax: (973) 232-0887
                                                       jspiro@spiroharrison.com

                                                       David B. Harrison (*pro hac vice* forthcoming)
                                                       Thomas M. Kenny (*pro hac vice* forthcoming)
                                                       **SPIRO HARRISON & NELSON**
                                                       363 Bloomfield Avenue, Suite 2C
                                                       Montclair, NJ 07042
                                                       Phone: (973) 232-4109
                                                       Fax: (973) 232-0887
                                                       dharrison@spiroharrison.com
                                                       tkenny@spiroharrison.com

Danielle F. Moriber (*pro hac vice* forthcoming)
**SPIRO HARRISON & NELSON**
1221 Brickell Avenue, Suite 900
Miami, FL 33131
Phone: (786) 841-1181
Fax: (973) 232-0887
dmoriber@spiroharrison.com

R. Lyn Stevens (*pro hac vice* forthcoming)
**STEVENS LAW FIRM**
1782 Mountain Springs
Canyon Lake, Texas 78133
Phone: (409) 880-9714
lyn@stevens.law

*Counsel for Plaintiff and the Proposed Class*